IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| FELISHA BROOKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 8:19-cv-02315-GJH |
| | ) | |
| TV ONE, LLC, *et al.* | ) | ORAL ARGUMENT REQUESTED |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS AMENDED COMPLAINT**

**DAVIS WRIGHT TREMAINE LLP**

Lisa B. Zycherman (D. Md. Bar # 16969)
Constance M. Pendleton (*Pro hac vice pending*)
1919 Pennsylvania Avenue, NW, Suite 800
Washington, DC  20006
Ph: 202-973-4200; Fax:  202-973-4499
lisazycherman@dwt.com
conniependleton@dwt.com

*Counsel for Defendants TV One, LLC and Jupiter
Entertainment*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.      PRELIMINARY STATEMENT ................................................................ 1

II.     BACKGROUND ......................................................................................... 5

    A.    The Program ......................................................................................... 5

    B.    Plaintiff ................................................................................................. 9

    C.    Defendants ........................................................................................... 10

III.    ARGUMENT ............................................................................................. 10

    A.    Plaintiff's Claims are Time-Barred ..................................................... 10

    B.    Plaintiff's Defamation Claim Fails as a Matter of Law ...................... 12

        1.    Plaintiff Fails to Plausibly Plead Any Defamatory Statements ........... 13

        2.    The Program Is Immune From Liability Under The Fair Report Privilege .......... 16

        3.    The Program is Non-Actionable Opinion ............................................. 17

        4.    The Program Was Not Broadcast with Fault ....................................... 20

        5.    Plaintiff Fails to Plausibly Plead Substantially Falsity ........................ 26

    C.    Plaintiff's Privacy Claim Fails as a Matter of Law .............................. 29

    D.    Plaintiff's Other Tort Claims Fail as a Matter of Law .......................... 32

        1.    The Amended Complaint Fails to State a Claim for Emotional Distress ............ 33

        2.    The Amended Complaint Fails to State a Claim for Negligence ......................... 34

IV.    CONCLUSION .......................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abbas v. Foreign Policy Grp.*,
  783 F.3d 1328 (D.C. Cir. 2015) ............................................................................... 18

*Agora, Inc. v. Axxess, Inc.*,
  90 F. Supp. 2d 697 (D. Md. 2000), *aff'd*, 111 F. App'x 99 (4th Cir. 2001) ........................... 18

*AIDS Counseling & Testing Ctrs. v. Group W Television, Inc.*,
  903 F.2d 1000 (4th Cir. 1990) ............................................................... 27, 28, 29

*Arthur v. Offit*,
  No. 01:09-cv-1398, 2010 WL 883745 (E.D. Va. Mar. 10, 2010) ........................................ 18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................. *passim*

*Bass v. E.I. DuPont Nemours & Co.*,
  28 F. App'x 201 (4th Cir. 2002) ............................................................................ 12

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................. 3, 13, 16, 22

*Bell v. Associated Press*,
  584 F. Supp. 128 (D.D.C. 1984) ............................................................................. 23

*Bey v. Shapiro Brown & Alt, LLP*,
  997 F. Supp. 2d 310 (D. Md.), *aff'd*, 584 F. App'x 135 (4th Cir. 2014) ................................. 5

*Biospherics, Inc. v. Forbes, Inc.*,
  989 F. Supp. 748 (D. Md. 1997), *aff'd*, 151 F.3d 180 (4th Cir. 1998) ................................... 17

*Biro v. Condé Nast*,
  963 F. Supp. 2d 255 (S.D.N.Y. 2013), *aff'd*, 80 F.3d 541 (2d Cir. 2015) ............................... 23

*Boccone v. American Express Co.*,
  No. RDB 05-34336, 2007 WL 2914909 (D. Md. Oct. 4, 2007) ............................................. 26

*Boley v. Atlantic Monthly Grp.*,
  950 F. Supp. 2d 249 (D.D.C. 2013) ........................................................................ 20

*Brown v. Ferguson Enters., Inc.*,
  No. CCB-12-1817, 2012 WL 6185310 (D. Md. Dec. 11, 2012) ........................................ 14, 29

*Bustos v. A&E Television Networks*,
646 F.3d 762 (10th Cir. 2011) ...................................................................27

*CACI Premier Tech. v. Rhodes*,
536 F.3d 280 (4th Cir. 2008) ....................................................................23

*Chaiken v. VV Publ'g Corp.*,
119 F.3d 1018 (2d Cir. 1997).....................................................................24

*Chapin v. Knight-Ridder, Inc.*,
993 F.2d 1087 (4th Cir. 1993) ......................................................17, 18, 21

*Cohen v. Cowles Media Co.*,
501 U.S. 663 (1991).....................................................................................32

*Cox Broad. Corp. v. Cohn*,
420 U.S. 469 (1975).....................................................................................31

*D&G Flooring, LLC v. Home Depot U.S.A., Inc.*,
346 F. Supp. 2d 818 (D. Md. 2004) ...........................................................14

*Davis v. Costa-Gavras*,
654 F. Supp. 653 (S.D.N.Y. 1987) .............................................24, 25, 28

*Diario El Pais, S.L. v. Nielson Co. (US)*,
No. 07CV11295, 2008 WL 4833012 (S.D.N.Y. Nov. 6, 2008) ...........23

*Dobkin v. Johns Hopkins Univ.*,
No. 96-1715, 1999 WL 22901 (4th Cir. 1999) ........................................29

*Doe v. Salisbury Univ.*,
123 F. Supp. 3d 748 (D. Md. 2015) .............................................13, 14, 23

*Egiazaryan v. Zalmayev*,
No. 11 Civ. 2670, 2011 WL 6097136 (S.D.N.Y. Dec. 7, 2011)...........23

*English Boiler & Tube, Inc. v. W.C. Rouse & Son, Inc.*,
172 F.3d 862, 1999 WL 89125 (4th Cir. 1999),
*aff'd*, 519 F. App'x 199 (4th Cir. 2013)....................................................14

*Farah v. Esquire Magazine*,
736 F.3d 528 (D.C. Cir. 2013) ...................................................13, 18, 32, 33

*Fitzgerald v. Penthouse Int'l, Ltd.*,
691 F.2d 666 (4th Cir. 1982) .....................................................................21

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
194 F.3d 505 (4th Cir. 1999) .....................................................................33

*Gainsburg v. Steben & Co.*,
  838 F. Supp. 2d 339 (D. Md. 2011) ....................................................................................14

*Garrison v. Louisiana*,
  379 U.S. 64 (1964)...........................................................................................................22

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974).............................................................................................17, 21, 26

*Ginsburg v. Agora, Inc.*,
  915 F. Supp. 733 (D. Md. 1995) ......................................................................................35

*Hakky v. Washington Post Co.*,
  No. 8:09-cv-2406, 2010 WL 2573902 (M.D. Fla. June 24, 2010) ...............................23, 26

*Hanks v. Wavy Broad., LLC*,
  No. 2:11cv439, 2012 WL 405065 (E.D. Va. Feb. 8, 2012)................................................23

*Hatfill v. New York Times Co.*,
  416 F.3d 320 (4th Cir. 2005) .......................................................................................13, 34

*Henderson v. Claire's Stores, Inc.*,
  607 F. Supp. 2d 725 (D. Md. 2009), *aff'd*, 422 F. App'x 269 (4th Cir. 2011) ......................22

*Henry v. Nat'l Ass'n of Air Traffic Specialists*,
  836 F. Supp. 1204 (D. Md. 1993), *aff'd*, 34 F.3d 1066 (4th Cir. 1994) ...............................22

*Hickey v. St. Martin's Press, Inc.*,
  978 F. Supp. 230 (D. Md. 1997) ......................................................................................12

*Hodge v. Coll. of S. Md.*,
  121 F. Supp. 3d 486 (D. Md. 2015), *aff'd*, 646 F. App'x 294
  (4th Cir. 2016).................................................................................................................32

*Hovatter v. Widdowson*,
  No. Civ.CCB-03-2904, 2004 WL 2075467 (D. Md. Sept. 15, 2004).....................................12

*Hustler Magazine, Inc. v. Falwell*,
  485 U.S. 46 (1988)...........................................................................................................32

*Interphase Garment Sols., LLC v. Fox Television Stations, Inc.*,
  566 F. Supp. 2d 460 (D. Md. 2008) ............................................................................11, 31

*Kahl v. Bureau of Nat'l Affairs, Inc.*,
  856 F.3d 106 (D.C. Cir. 2017) ..........................................................................................24

*Kelson v. Spin Publ'ns, Inc.*,
  No. HAR-87-16, 1988 WL 52192 (D. Md. May 19, 1988)...................................................33

*Laber v. Harvey*,
    438 F.3d 404 (4th Cir. 2006) ...................................................................................5

*Levin v. McPhee*,
    119 F.3d 189 (2d Cir. 1997)...................................................................................19

*Liberty Lobby, Inc. v. Rees*,
    852 F.2d 595 (D.C. Cir. 1988) ..............................................................................27

*Lohrenz v. Donnelly*,
    350 F.3d 1272 (D.C. Cir. 2003) .......................................................................22, 24

*Luy v. Baltimore Police Dep't*,
    326 F. Supp. 2d 682 (D. Md. 2004) .......................................................................12

*Machie v. Manger*,
    No. AW-09-2196, 2010 WL 2132223 (D. Md. May 25, 2010).............................12

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991)..........................................................................................27, 28

*Mayfield v. NASCAR, Inc.*,
    674 F.3d 369 (4th Cir. 2012) ...........................................................................13, 23

*McFarlane v. Esquire Magazine*,
    74 F.3d 1296 (D.C. Cir. 1996) .........................................................................21, 24

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974)...............................................................................................24

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990)...................................................................................................17

*Moldea v. N.Y. Times Co.*,
    22 F.3d 310 (D.C. Cir. 1994) ................................................................................32

*Murray v. United Food & Commercial Workers Int'l Union, Local 400*,
    229 F. Supp. 2d 465 (D. Md. 2003), *aff'd*, 100 F. App'x 165 (4th Cir. 2004) .......27

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)............................................................................................4, 20

*Nanji v. Nat'l Geographic Soc'y*,
    403 F. Supp. 2d 425 (D. Md. 2005) .......................................................................17

*Nichols v. Moore*,
    477 F.3d 396 (6th Cir. 2007) .................................................................................27

*Olukoya v. Sowore*,
  No. TDC-18-2922, 2019 WL 3501567 (D. Md. Aug. 1, 2019) ....................................16, 27, 29

*Pan Am Sys., Inc. v. Hardenbergh*,
  871 F. Supp. 2d 6 (D. Me. 2012) ..........................................................................................23

*Parisi v. Sinclair*,
  845 F. Supp. 2d 215 (D.D.C. 2012) ................................................................................23, 26

*Partington v. Bugliosi*,
  56 F.3d 1147 (9th Cir. 1995) ...............................................................................................28

*Reuber v. Food Chem. News*,
  925 F.2d 703 (4th Cir. 2009) ..........................................................................................30, 31

*Robinson v. Vitro Corp.*,
  620 F. Supp. 1066 (D. Md. 1985) ........................................................................................11

*Ryan v. Brooks*,
  634 F.2d 726 (4th Cir. 1980) ...............................................................................................23

*Schatz v. Republican State Leadership Comm.*,
  669 F.3d 50 (1st Cir. 2012) ..................................................................................................23

*Schnare v. Ziessow*,
  104 F. App'x 847 (4th Cir. 2004) .........................................................................................18

*Seale v. Gramercy Pictures*,
  964 F. Supp. 918 (E.D. Pa. 1997), *aff'd*, 156 F.3d 1225 (3d Cir. 1998) ..............................28

*Smith v. McGraw*,
  No. 10-cv-02310, 2011 WL 1599579 (D. Md. 2011) ...........................................................13

*Snyder v. Phelps*,
  580 F.3d 206 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011) ....................................................31

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ................................................................................................31, 32, 34

*Solomon v. National Enquirer, Inc.*,
  No. DKC 95-3327, 1996 WL 635384 (D. Md. June 21, 1996) ..............................................30

*St. Amant v. Thompson*,
  390 U.S. 727 (1968) ............................................................................................................22

*Street v. NBC*,
  645 F.2d 1227 (6th Cir. 1981) .............................................................................................25

*Tani v. Washington Post*,
  No. PJM 08-1130, 2009 WL 8652384 (D. Md. June 18, 2009),
  *aff'd*, 352 F. App'x 792 (4th Cir. 2009)............................................................11, 34

*Tavoulareas v. Piro*,
  817 F.2d 762 (D.C. Cir. 1987) .................................................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...................................................................................................12

*Time, Inc. v. Pape*,
  401 U.S. 279 (1971)...................................................................................................24

*Trundle v. Homeside Lending, Inc.*,
  162 F. Supp. 2d 396 (D. Md. 2001) ........................................................................27

*Velencia v. Drezhlo*,
  No. RDB-12-0237, 2012 WL 6562764 (D. Md. Dec. 13, 2012) ...........................14

*Waldbaum v. Fairchild Publ'ns, Inc.*,
  627 F.2d 1287 (D.C. Cir. 1980) ..............................................................................20

*Watkins v. CNN*,
  No. GJH-17-780, 2018 WL 1970747 (D. Md. Apr. 25, 2018) .......................12, 13, 15, 20, 27

*Watkins v. Washington Post*,
  No. PWG-17-818, 2018 WL 805394 (D. Md. Feb. 9, 2018)......................11, 13, 26

*Wharton v. Columbia Pictures Indus., Inc.*,
  907 F. Supp. 144 (D. Md. 1995) ..............................................................................33

*Wimbush v. Kaiser Found. Health Plan of Mid Atl. States, Inc.*,
  No. TDC-14-0525, 2015 WL 2090654 (D. Md. May 4, 2015) ...............................12

*Winn v. United Press Int'l*,
  938 F. Supp. 39 (D.D.C. 1996), *aff'd*, 1997 WL 404959 (D.C. Cir. 1997)............................26

**State Cases**

*Allen v. Bethlehem Steel Corp.*,
  547 A.2d 1105 (Md. Ct. Spec. App. 1988) ............................................................11

*Andreason v. Guard Publ'g Co.*,
  489 P.2d 944 (Or. 1971) ...........................................................................................15

*Bagwell v. Peninsula Reg'l Med. Ctr.*,
  665 A.2d 297 (Md. Ct. Spec. App. (1996)),
  *aff'd*, 120 F. App'x 465 (4th Cir. 2005).................................................................12

*Batson v. Shiflett*,
  602 A.2d 1191 (Md. 1992) ..............................................................28, 29, 33

*Bilney v. Evening Star Newspapers Co.*,
  406 A.2d 652 (Md. Ct. Spec. App. 1979) ..............................................31

*Booth Glass Co. v. Huntingfield Corp.*,
  500 A.2d 641 (Md. 1985) ......................................................................11

*Capital-Gazette Newspapers, Inc. v. Slack*,
  445 A.2d 1038 (Md. 1982) ....................................................................20

*Carlisle v. Fawcett Publ'ns, Inc.*,
  20 Cal. Rptr. 405 (Cal. Ct. App. 1962) ................................................21

*Carr v. Watkins*,
  177 A.2d 841 (Md. 1962) ......................................................................29

*Carter v. Aramark Sports & Entm't Servs., Inc.*,
  835 A.2d 262 (Md. Ct. Spec. App. 2003) ..............................................33

*Don King Prods., Inc. v. Walt Disney Co.*,
  40 So. 3d 40 (Fla. Dist. Ct. App. 2010) ................................................23

*Furman v. Sheppard*,
  744 A.2d 583 (Md. Ct. Spec. App. 2000) ..............................................30

*Harris v. Jones*,
  380 A.2d 611 (Md. 1977) ......................................................................33

*Heath v. Hughes*,
  197 A.2d 104 (Md. 1964) ......................................................................27

*Koren v. Capital-Gazette Newspapers, Inc.*,
  325 A.2d 140 (Md. Ct. Spec. App. 1974) ..............................................27

*Lindenmuth v. McCreer*,
  165 A.3d 544 (Md. Ct. Spec. App. 2017) ..............................................13

*McCauley v. Suls*,
  716 A.2d 1129 (Md. Ct. Spec. App. 1998) ............................................30

*Mullin v. Washington Free Weekly, Inc.*,
  785 A.2d 296 (D.C. 2001) ....................................................................11

*New Summit Assocs. Ltd. P'ship v. Nistle*,
  533 A.2d 1350 (Md. Ct. Spec. App. 1987) ............................................30

*Pemberton v. Bethlehem Steel Corp.*,
    502 A.2d 1101 (Md. Ct. Spec. App. 1986) ................................................................30, 31, 34

*Piscatelli v. Van Smith*,
    35 A.3d 1140 (Md. 2012) ...........................................................................................16, 29, 32

*Saley-Radtke v. Hosmane*,
    149 A.3d 573 (Md. 2016) ....................................................................................................17

*Staten v. Sammons*,
    No. 1872 Sept. Term 2015, 2016 WL 6465212
    (Md. Ct. Spec. App. Oct. 31, 2016) .....................................................................................12

*Telnikoff v. Matusevitch*,
    702 A.2d 230 (Md. 1997) .....................................................................................................27

*Walpert, Smullian & Blumenthal, P.A. v. Katz*,
    762 A.2d 582 (Md. 2000) .....................................................................................................34

**Constitutional Provisions**

U.S. Cons. amend. I ......................................................................................................... *passim*

U.S. Const. amend. XIV ..........................................................................................................31

**State Statutes**

Fla. Stat. § 95.11(3)(a) ...........................................................................................................11

Fla. Stat. § 95.11(3)(o) ...........................................................................................................11

Fla. Stat. § 95.11(4)(g) ...........................................................................................................11

Md. Code Ann., Cts. & Jud. Proc. § 5-105 .............................................................................11

Tenn. Code Ann. § 28-3-104 ...................................................................................................11

Tenn. Code Ann. § 28-3-104(a)(1) ..........................................................................................11

**Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................................................................13

Fed. R. Civ. P. 12(b)(6) ...................................................................................................... *passim*

L.R. 105 ....................................................................................................................................1

**Other Authorities**

Hon. Robert D. Sack, *Sack on Defamation*, § 5:5.2 (2011) ............................................................24

http://gm5-
    lkweb.newscyclecloud.com/article/20100804/NEWS/801247345?template=a
    mpart ...........................................................................................................................................10

https://www.jacksonville.com/article/20100805/NEWS/801247263 .............................................9

https://www.jacksonville.com/article/20100812/NEWS/801246788 .............................................9

https://www.news4jax.com/news/man-pleads-not-guilty-to-killing-wifes-
    boyfriend .....................................................................................................................................10

https://www.questia.com/newspaper/1G1-233547210/jealous-ex-husband-and-
    killer-defense-says-no-jeffery ....................................................................................................10

Pursuant to Federal Rule of Civil Procedure 12(b)(6), L.R. 105, and based on the accompanying Memorandum of Law, Declaration of Constance M. Pendleton, and attached exhibit, Defendants TV One, LLC and Jupiter Entertainment (collectively, "Defendants" or the "Served Defendants")[1] move the Court to dismiss this action for failure to state a claim upon which relief can be granted.

## I.        PRELIMINARY STATEMENT

Plaintiff's defamation suit arises from an episode of the cable series "Fatal Attraction," titled "If I Can't Have You," which first aired on the TV One network in March 2014 (the "Program").  Am. Compl. ¶ 13.[2]  The episode tells the story of a lovers' triangle that leads to the murder of Plaintiff's husband – Michael Brooks – and the trial and conviction of his killer Jeffery Washington, the ex-husband of Mr. Brooks' girlfriend, Dorothy Washington.  Through dramatizations and interviews with law enforcement, prosecutors, a defense attorney, family members of the deceased, witnesses, a journalist, and a psychologist, the Program raises questions and examines multiple theories about Mr. Brooks' death while it follows the law enforcement investigation, and ultimate trial, conviction, and sentencing of Mr. Washington for the murder.

Plaintiff complains that the Program depicts her as a murder suspect, but never alleges that the asserted depiction is false.  As the estranged wife of a murder victim (who was romantically involved with another women at the time of his death), questions naturally arose as to whether Plaintiff could have had any role in her husband's death.  But any such questions are quickly dispensed with in the Program, and viewing the depiction of Plaintiff in the context of

---

[1] Defendant Todd Moss has not been served.

[2] *See* Declaration of Constance M. Pendleton, Ex. A (the "Program").

the whole Program, there is no question she is innocent.  In the Program, Plaintiff, portrayed by an actor in a dramatization, denies any involvement in her husband's death, telling detectives: "Absolutely not.  I loved him . . . I still cared about him."  (0:13:06.)  And the narrator reports that police find Plaintiff "genuinely devastated by the news of his death."  (0:12:45.)  She "has already moved on with her life, making jealousy a flimsy motive at best."  (0:13:10)  In case there is any doubt in viewers' minds, the Program emphasizes that "Police realize pretty quickly that Michael's wife could not have orchestrated this attack."  (0:13:19.)  After Plaintiff's fleeting appearance the Program quickly "shifts," (Am. Compl. ¶ 25), into an investigation focused on the man eventually convicted of the crime, Jeffrey Washington.

Plaintiff also complains that the Program misrepresents the state of her marriage as "miserable," and incorrectly portrays Plaintiff and her husband as "separated" and "divorced" during the affair.  Am. Compl. ¶¶ 17-18.  Plaintiff's beef with Defendants seems in part that she was not interviewed and featured on the Program *more* prominently, asserting "[t]here was little-to-no mention that the Brooks' had a minor child in common," and "even less mention of the Plaintiff," and that "virtually all the romantic scenes focused exclusively" on her former husband's affair with another woman – arguments at odds with Plaintiff's invasion of privacy claim.  *Id.* ¶ 20.

The Amended Complaint should be dismissed because it fails to state claims for defamation, invasion of privacy, negligence or intentional infliction of emotional distress for the following separate and independent reasons:

As a threshold matter, all of Plaintiff's claims, based on a program that aired "in or about March 2014," are time-barred under Maryland's one-year statute of limitations for defamation and three-year limitations period for Plaintiff's other claims.  The cause of action accrued and the

limitations period expired as a matter of law before the Amended Complaint was filed.  Under

Maryland's single publication rule, any more recent re-airings of the Program would not salvage

Plaintiff's time-barred claims.  (Point I.)

As to the elements of Plaintiff's defamation claim, the Program is not reasonably capable

of a defamatory meaning as a matter of law because it does not cast Plaintiff as a criminal, or

otherwise tend to lower Plaintiff in the estimation of the community, but instead clearly sets forth

the well-publicized facts surrounding the apprehension and conviction of her husband's killer,

leaving no doubt that Plaintiff is innocent.  Nor is it defamatory to depict Plaintiff as separated or

divorced when her husband was in a well-documented romantic relationship with another

woman. The claim is implausible on its face under *Iqbal* and *Twombly* because Plaintiff does not

supply enough facts about the allegedly actionable statements in the Program to state a claim.

(Point II.A.)  In addition, the Program is immune from liability as a matter of law under

Maryland's fair report privilege because it accurately and fairly reports on a police investigation

and court proceedings and not only includes Plaintiff's denials, but also makes very clear she

was not involved in any crime.  (Point II.B.)

Plaintiff's allegations that the docudrama depicts her husband as "utterly miserable" in

his marriage, Am. Compl. ¶ 17, "free to live his life" with his lover apart from Plaintiff, *id*. ¶ 18,

and that those associated with the "romance" were "evil" – even if a fair interpretation of the

Program – are non-actionable expressions of opinion and cannot as a matter of law form the

basis of a defamation claim.  In addition, questions, theory testing, and speculation about

possible culprits that set forth the facts upon which those questions are based, dismiss those

possibilities, and definitively identify the true killer are also protected, non-actionable opinion.

(Point II.C.)

As the wife of the victim of a first degree murder, Plaintiff is a limited-purpose public figure.  Plaintiff cannot plead, much less prove, as she must, by clear and convincing evidence that Defendants published the Program with actual malice – that is, with knowledge of falsity or reckless disregard for the truth, the stringent standard of fault applicable in this case.  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).  Even if she were deemed to be a private figure, Plaintiff cannot plausibly plead fault because Defendants relied on reputable sources, including public records, interviews with police detectives, prosecutors, and family members of the victim, and therefore were not negligent, much less acting with actual malice.  (Point II.D.)

Finally, the Amended Complaint fails to state a claim for defamation as a matter of law because it cannot plausibly allege – much less prove – that any statement in the Program is substantially false.  Whether Plaintiff and Mr. Brooks were married, formally or informally separated, or divorced at the time of his death, it is well-established in police reports, court testimony, and news reports, upon which Defendants relied, that Mr. Brooks was embroiled in a romantic relationship with Ms. Washington.  Even if it were false that Plaintiff and Mr. Brooks were separated or that he filed for divorce in the late fall of 2008, the effect on the mind of the viewer is no different than the truth.  (Point II.E.)

As to Plaintiff's other asserted causes of action, her privacy claim is barred for the same reasons as her defamation claim and because she fails to plausibly plead facts that make out the elements of a privacy claim about these matters of public record.  (Point III.A.)  Plaintiff's intentional infliction of emotional distress and negligence claims fail as well because they do not and cannot plausibly plead the necessary elements of these torts, and are a clear attempt to end-run the speech protections provided by the First Amendment to the U.S. Constitution.  (Point III.B.)

For all these reasons, Plaintiff's Amended Complaint should be dismissed with prejudice in its entirety as a matter of law.[3]

## II.    BACKGROUND

### A.    The Program

The Program depicts through dramatizations "a couple in the throes of newfound love" (0:00:06) – a relationship complicated by the fact that the new lovers were or are each married to other people, a complication that leads to the well-publicized murder of Plaintiff's husband, Michael Brooks.  The Program's 45:20 minutes dramatize and examine the police investigation into the crime, raising questions about who could have killed Mr. Brooks, before police set their sights on Mr. Washington, the ex-husband of the victim's lover.  The Program describes in great detail the arc of the criminal case – from Mr. Washington's arrest and trial, to his conviction and sentence to life in prison with no possibility of parole.  (0:43:07.)

Disclaimers introduce the Program stating **"WARNING: This program contains dramatizations and intense violence that may be unsuitable for some viewers.  Individuals depicted are innocent until proven guilty in a court of law.  Viewer discretion is advised."** These disclaimers are repeated *three more times* in the Program, each appearing on the screen for several seconds before Acts 2, 3, and 5.

---

[3] Defendants seek dismissal with prejudice because it is clear from the face of the Amended Complaint, and the Program that it incorporates by reference, that Plaintiff cannot plausibly allege facts that would constitute any asserted cause of action, and that any further amendment could not rectify the deficiencies in Plaintiff's untimely claims.  *See Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) ("leave to amend … should be denied … when … the amendment would have been futile") (citation omitted); *Bey v. Shapiro Brown & Alt, LLP*, 997 F. Supp. 2d 310, 319 (D. Md.), *aff'd*, 584 F. App'x 135 (4th Cir. 2014) (same).

The Cold Open – the introduction to the Program – portrays the encounter that resulted in Mr. Brooks' death, establishing from the beginning that the assailant is a man.[4]  The Program dramatizes the events as detectives try to solve the murder, asking:  "[W]hat exactly could have sparked this deadly shooting?  And who was responsible?"  (0:04:55.) The Program describes how an affair developed between Mr. Brooks and Ms. Washington, despite the fact that both were married to other people.  (0:7:26.) "Neither one of them were exactly in the throes of marital bliss," the Program says.  Mr. Brooks' brother, interviewed on camera, corroborates the affair, and tells viewers, "My brother, he wasn't as happy as he was supposed to be in the marriage."  (0:07:44.) The narrator states that "After months of concealing their feelings for each other – in the late fall of 2008, Michael and Dorothy decide to come clean to their spouses and file for divorce."  (0:07:49.)

In Act 2, "[p]olice turn to Michael's grieving friends and family for answers." "Apparently, Michael's ex-wife Felisha likened their recent separation to salt on an open wound," the narrator says.  (0:11:48.) Mr. Brooks' brother says in an on-camera interview that "Michael's wife was very emotional."  (0:12:10.) "Is it possible Felisha was so enraged over Michael's budding romance with Dorothy that she did something drastic?" the narrator asks.  *Id.* A Jacksonville, Florida resident is interviewed and posits "When that one person falls out of love and the other one doesn't then a lot of times a volatile situation can come from that."  *Id.*  "So volatile," the narrator continues, "that detectives now speculate that the man who attacked Michael and Dorothy may have done so at Felisha's behest."  (0:12:30.) A psychologist

---

[4] In audio replayed from a 911 call, Ms. Washington screams:  "That ***man*** got a gun."  (0:00:33) (emphasis added).

interviewed in the Program theorizes that "Anything's possible when love and passion are involved.  She could have hired somebody to kill him."  (0:12:38.)

The narrator then examines and immediately debunks this theory:  "***But when police speak to Michael's estranged wife Felisha, she seems genuinely devastated by the news of his death***," the narrator explains. *Id.* (emphasis added).  A dramatization follows in which an actor depicting Plaintiff speaks with police detectives and denies any involvement in Mr. Brooks' death.  "Oh my God.  Is he okay?  Is he dead?" she is depicted asking police detectives when she learns the news of her husband's death, her hand clasped over her mouth.  (0:12:55.) A detective asks the Plaintiff "When was the last time you've seen Michael?"  (0:13:00.) Plaintiff responds "About six months ago when we were separated." *Id.*  Detective:  "***Did you have anything to do with his murder?***" *Id.*  "***Absolutely not***," she says, ***shaking her head***, "***I loved him . . . I still cared about him***."  (0:13:06 (emphasis added).)  The Program then expressly dismisses any possibility that Plaintiff could be a suspect:  "***it seems Felisha has already moved on with her life, making jealousy a flimsy motive at best***."  (0:13:10.) The psychologist interviewed reinforces Plaintiff's innocence:  "***Police realize pretty quickly that Michael's wife could not have orchestrated this attack***."  (0:13:19 (emphasis added).)

"But if Felisha isn't behind this attack, then just who is?" the narrator then asks. (0:13:24.) The story moves rapidly to describe and dramatize a police interview with witness Dorothy Washington.  (0:13:29.) A detective from the Jacksonville Sheriff's Office explains in an on-screen interview that Mr. Brooks spent the night before the murder at Ms. Washington's apartment.  Ms. Washington's states:  "He kicked the door in.  It was Jeffrey [Washington]." (0:14:28.) "Dorothy tells investigators the attacker is none other than her estranged husband, Jeffrey Washington," the narrator explains. *Id.*  The remainder of the Program describes through

7

interviews with police detectives, prosecutors, defense attorneys, a journalist, and dramatizations

of the case, how Mr. Washington committed the crime.

In Act 3, the narrator again explains that "According to Dorothy" – an eye witness to the

crime – "her estranged husband, 44 year old Jeffrey Washington, had been responsible for the

unprovoked attack."  (0:18:33.) Police Detective Hougland reinforces this conclusion in an

interview:  "Dorothy Washington actually stated that Jeffrey Washington definitely was the bad

guy in this story."  (0:18:47.) The Program reenacts the manhunt, but raises questions about

whether Mr. Washington could indeed have committed this crime.  Mr. Washington turns

himself in to police (0:20:40), and he is depicted telling police his side of the story – that he went

to Dorothy Washington's apartment to talk, that Mr. Brooks was aggressive, there was a

struggle, Ms. Washington came after Mr. Washington with a gun, shots were fired, and Mr.

Washington was shot in the stomach and fled the scene – all of which is dramatized for viewers

and interspersed with real interrogation footage of Mr. Washington which is visually distinct

from the dramatizations using actors.  (0:20:55-0:24:46.)  The Program continues to describe the

police investigation and the questions and possibilities this new evidence raises, but never

revisits whether Plaintiff might be a suspect.[5]

Act 4 begins with more questions:  "Is it possible Jeffery's children were being abused?"

(0:26:12.) And the alternate theories continue in Act 5, until the "pendulum" swings, (0:31:45),

and the Program reports how "surveillance footage," a "court order" Ms. Washington had

_____

[5]  "For police, Jeffrey's side of the story raises a number of troubling possibilities.  Could
Michael Brooks have indeed been the instigator?  Or worse, could he and Dorothy have
conspired to lure Jeffrey to her apartment in order to eliminate him from their lives once and for
all?" the narrator asks.  (0:24:57.) The psychologist interviewed on camera opines that "There's
always more than one side to any story, and this story definitely had two sides."  (0:25:16.) But
new information emerges, the narrator says, "calling into question everything detectives think
they know about [the] Washington[s]."  (0:25:20.)

obtained against her estranged husband, and "forensic evidence" "all leads authorities to one conclusion." (0:32:45.) "Prosecutors charge Jeffery Washington with first degree murder, attempted murder, armed burglary, and aggravated battery domestic violence." (0:32:59.)

Act 6 describes Mr. Washington's trial, including prosecutors' opening statements and closing arguments presenting their theories of Mr. Washington's guilt, trial testimony from Ms. Washington and her ten-year-old daughter, and testimony from 12 character witnesses and Mr. Washington himself in support of his defense of self-defense. (0:38:51; 0:41:37.) Again, Plaintiff is not mentioned as having any role in the trial. In Act 8, the Program informs viewers of the uncontroverted outcome of the case: the jury has found Mr. Washington "guilty on all counts," (0:43:25), and, although prosecutors pressed for the death penalty, the "Judge gives him a life sentence with no possibility of parole." (0:44:05.) The questions have been answered, the case has been solved, and the guilty man has been brought to justice.

Plaintiff is not mentioned once in the eight-Act Program after her brief appearance in Acts 1 and 2 at minutes 7 and 12, when questions posed about her possible role are dismissed and she is clearly ruled out as a possible suspect.

### B.      Plaintiff

Plaintiff Felisha Brooks was the wife of Michael Brooks, the victim of the well-publicized murder that occurred in Jacksonville, Florida on May 13, 2009 that is the subject of the Program.[6] Mr. Brooks was killed at the hands of his girlfriend's ex-husband, Jeffery

---

[6] https://www.jacksonville.com/article/20100805/NEWS/801247263;
https://www.jacksonville.com/article/20100812/NEWS/801246788;
https://www.questia.com/newspaper/1G1-233547210/jealous-ex-husband-and-killer-defense-says-no-jeffery;
https://www.news4jax.com/news/man-pleads-not-guilty-to-killing-wifes-boyfriend;
http://gm5-lkweb.newscyclecloud.com/article/20100804/NEWS/801247345?template=ampart

Washington.  Mr. Washington was tried before a jury, found guilty, and sentenced to life in prison.

### C.      Defendants

Defendant TV One is a cable television network launched in 2004 and headquartered in Silver Spring, Maryland.  TV One aired the Program, episode 212, of its long-running series, "Fatal Attraction."  TV One is owned by Urban One, the largest multimedia company in the U.S. primarily targeting African-American, urban and millennial audiences.  TV One's programming is created primarily for a diverse, adult, African-American audience and contains a broad range of original lifestyle and entertainment-focused programs, documentaries, movies, concert performances and sitcom reruns, and the only live daily news program dedicated to African-American viewers.

The Program was produced by television production company, Jupiter Entertainment. For over twenty years, Jupiter has produced television and cable programs for networks including TV One, A&E, Discovery Channel, History, Investigation Discovery, Oxygen, Reelz, TLC, TruTV, Fuse, and Animal Planet.  Defendant Todd Moss – who has not been served in this action – is listed in the Program credits as "Executive producer/writer."  He is Vice President of Programming and an Executive Producer at Jupiter.

### III.      ARGUMENT

#### A.      Plaintiff's Claims are Time-Barred

Each and every claim against Defendants in this case is time-barred because the Program first aired "in or about March 2014," Am. Compl. ¶ 13, almost five and a half *years* before Plaintiff filed this lawsuit.  The statute of limitations in Maryland is one year for defamation

(Md. Code Ann., Cts. & Jud. Proc. § 5-105),[7] and three years for invasion of privacy (*Allen v. Bethlehem Steel Corp.*, 547 A.2d 1105, 1108 (Md. Ct. Spec. App. 1988) (false light invasion of privacy)), negligence (*Booth Glass Co. v. Huntingfield Corp.*, 500 A.2d 641, 641 n.1 (Md. 1985), and intentional infliction of emotional distress (*Robinson v. Vitro Corp.*, 620 F. Supp. 1066, 1072 (D. Md. 1985)).  As a mass media publication, the limitations period here is triggered by the Program's publication date, not the date Plaintiff may have discovered it.  *Watkins v. Washington Post*, No. PWG-17-818, 2018 WL 805394, at *3 (D. Md. Feb. 9, 2018).  Where, as here, the Program is available online "and could have been discovered immediately," the statute of limitations begins to accrue on the date the Program first broadcast.  *See Tani v. Washington Post*, No. PJM 08-1130, 2009 WL 8652384, at *2 (D. Md. June 18, 2009), *aff'd*, 352 F. App'x 792 (4th Cir. 2009); *Interphase Garment Sols., LLC v. Fox Television Stations, Inc.*, 566 F. Supp. 2d 460, 464 (D. Md. 2008); *accord Mullin v. Washington Free Weekly, Inc.*, 785 A.2d 296, 299 (D.C. 2001) ("[E]very other court squarely faced with this issue [has] reject[ed] application of the discovery rule in mass media defamation claims.").

Even if, as Plaintiff alleges, the Program "continues to air via [TV One's] OnDemand features," "its website . . . television station or other media outlets," Am. Compl. ¶¶ 44, 61, re-

---

[7] Even if the limitations period from another jurisdiction applied, the same result follows.  The limitations period has run under the law of Florida, where Plaintiff resides.  Am. Compl. ¶ 4. *See* Fla. Stat. § 95.11(4) (g) (two years for libel); Fla. Stat. § 95.11(3) (o) (four years for privacy); Fla. Stat. § 95.11(3) (a) (four years for negligence); Fla. Stat. § 95.11(3) (o) (four years for intentional infliction of emotional distress).  And it has run in Tennessee, where Jupiter is located. Am. Compl. ¶ 6.  *See* Tenn. Code Ann. § 28-3-104(a) (1) (one year for libel); Tenn. Code Ann. § 28-3-104 (one year for personal tort claims including privacy, negligence, and intentional infliction of emotional distress).

airings would not salvage Plaintiff's time-barred claims.  Under Maryland's single publication rule, the statute of limitations runs from the date of the first broadcast.  *Hickey v. St. Martin's Press, Inc.*, 978 F. Supp. 230, 236 (D. Md. 1997); *Luy v. Baltimore Police Dep't*, 326 F. Supp. 2d 682, 692 (D. Md. 2004) (citing *Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 316 n.9 (Md. Ct. Spec. App. (1996)), *aff'd*, 120 F. App'x 465 (4th Cir. 2005).

Accordingly, each of Plaintiff's time-barred claims must be dismissed as against each Defendant.  *Bass v. E.I. DuPont Nemours & Co.*, 28 F. App'x 201, 205-06 (4th Cir. 2002) (affirming dismissal of time-barred defamation claim); *Machie v. Manger*, No. AW-09-2196, 2010 WL 2132223, at *6 (D. Md. May 25, 2010) (same); *Staten v. Sammons*, No. 1872 Sept. Term 2015, 2016 WL 6465212, at *1 (Md. Ct. Spec. App. Oct. 31, 2016) (*per curiam*) (affirming dismissal of invasion of time-barred privacy claim); *Hovatter v. Widdowson*, No. Civ.CCB-03-2904, 2004 WL 2075467, at *8 (D. Md. Sept. 15, 2004) (granting dismissal of time-barred privacy claim); *Wimbush v. Kaiser Found. Health Plan of Mid Atl. States, Inc*., No. TDC-14-0525, 2015 WL 2090654, at *8 (D. Md. May 4, 2015) (dismissing time-barred IIED claims).

## B.      Plaintiff's Defamation Claim Fails as a Matter of Law

The Amended Complaint fails to state a claim for defamation for several independent reasons.  In assessing Plaintiff's defamation claim, the court may take judicial notice of the Program and should read the allegations in the context of the entire Program.[8]  Courts have

---

[8]  When reviewing a motion to dismiss, the Court "may consider documents attached to the complaint, as well as documents attached to the motion to dismiss, if they are integral to the complaint and their authenticity is not disputed."  *Watkins v. CNN*, No. GJH-17-780, 2018 WL 1970747, at *3 (D. Md. Apr. 25, 2018) (Hazel, J.) (citation omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

stressed that Rule 12(b)(6) weeds out meritless claims.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007).  Such concerns are especially present in defamation cases where forcing defendants to incur unnecessary costs defending ultimately meritless suits can chill speech.[9] Thus, courts routinely dismiss libel claims, like Plaintiff's, at the pleadings stage before discovery for the deficiencies set forth in this motion.

### 1.    Plaintiff Fails to Plausibly Plead Any Defamatory Statements

Plaintiff's Amended Complaint should be dismissed because she fails to plead any defamatory statements.[10]  *See Hatfill v. New York Times Co.*, 416 F.3d 320, 329 (4th Cir. 2005) ("A defamation complaint, like any other civil complaint in federal court, must provide a 'short and plain statement of the claim showing that the pleader is entitled to relief.'") (quoting Fed. R. Civ. P. 8(a)(2)); *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 757-58 (D. Md. 2015) ("To satisfy federal pleading standards, a plaintiff must specifically allege each defamatory statement."). Plaintiff must plead more than a conclusory or generalized claim of harm.  *Watkins v. Washington Post*, 2018 WL 805394, at *2.  And the complaint must include more than Plaintiff's personal conclusions that she was victim of defamatory statements and her personal interpretation of facts rather than the facts themselves.  *See Smith v. McGraw*, No. 10-cv-02310,

---

[9] *Mayfield v. NASCAR, Inc.*, 674 F.3d 369, 377-78 (4th Cir. 2012) (applying *Iqbal* and *Twombly* pleading standards to Rule 12(b)(6) motion in  libel case and affirming trial court's dismissal because plaintiff's complaint contained only "conclusory" allegations of knowing or reckless falsity and "a mere recitation of the legal standard"); *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (recognizing in affirming Rule 12(b)(6) dismissal that "summary proceedings are essential in the First Amendment area because if a suit entails 'long and expensive litigation,' then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails") (citation omitted).

[10] To state a claim for defamation, Plaintiff must plead that "(1) … the defendant made a defamatory statement to a third person, (2) … the statement was false, (3) … the defendant was legally at fault in making the statement, and (4) … the plaintiff suffered harm."  *Watkins v. CNN*, 2018 WL 1970747, at*5 (quoting *Lindenmuth v. McCreer*, 165 A.3d 544, 552 (Md. Ct. Spec. App. 2017)).

2011 WL 1599579, at *8 (D. Md. 2011).[11]  Indeed, notice pleadings in the context of defamation

requires specific allegations because defamation claims, by their nature, rise and fall on the

words used and their context.[12]

Here, the Amended Complaint offers only broad, conclusory statements, without

detailing which statements in the Program Plaintiff contends are false and defamatory.  For

example, Plaintiff generally alleges that a theme in the Program was that Mr. Brooks was

"utterly miserable in his marriage," Am. Compl. ¶ 17, and that "those associated or involved

with the 'romance' are "evil," *id.* ¶ 42, but she does not claim to have been targeted as "evil"

herself or that the Program even uses these words.  Indeed, a review of the Program shows it

does not.  Plaintiff further alleges that after Mr. Brooks' murder "Defendants instantly suggest

Plaintiff may be a suspect," *id.* ¶ 23, and "accused Plaintiff of killing her own husband, and the

father of their minor child," *id.* ¶ 24, but she does not contend that this depiction of the police

investigation is false and she does not point to any narration in the Program that specifically

defames her.  Plaintiff further complains that she and her husband were not divorced or separated

at the time of his death, *id.* ¶ 33, and that the program leads viewers to believe that Mr. Brooks

---

[11] *See also Salisbury Univ.*, 123 F. Supp. 3d at 757 ("To satisfy federal pleading standards, a plaintiff must specifically allege each defamatory statement."); *Gainsburg v. Steben & Co.*, 838 F. Supp. 2d 339, 344 (D. Md. 2011) ("Every alleged defamatory statement constitutes 'a separate instance of defamation,' which 'a plaintiff must specifically allege.'") (quoting *English Boiler & Tube, Inc. v. W.C. Rouse & Son, Inc.*, 172 F.3d 862, 1999 WL 89125, at *3 (4th Cir. 1999)), *aff'd*, 519 F. App'x 199 (4th Cir. 2013); *D&G Flooring, LLC v. Home Depot U.S.A., Inc.*, 346 F. Supp. 2d 818, 824 (D. Md. 2004) (dismissing defamation claim where complaint failed to allege content of allegedly defamatory statements).

[12] *See, e.g.*, *Velencia v. Drezhlo*, No. RDB-12-0237, 2012 WL 6562764, at *8 (D. Md. Dec. 13, 2012) (generally alleging defamation and providing insufficient particularity to demonstrate a good faith claim for damages); *Brown v. Ferguson Enters., Inc.*, No. CCB-12-1817, 2012 WL 6185310, at *3 (D. Md. Dec. 11, 2012) (failure to allege "specific description of the content of the alleged statements," warranted dismissal especially "[b]ecause of the substantial factual and constitutional burden defamation plaintiffs must meet to prove liability").

and Ms. Washington met four days earlier than they actually did, *id.* ¶ 34, but she does not plausibly allege how these alleged statements are defamatory.

Moreover, the alleged depictions in the Program are simply not capable of the defamatory meaning Plaintiff urges.  A defamatory statement is "one 'which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing with, that person.'" *Watkins v. CNN*, 2018 WL 1970747, at *5 (citations and internal quotation marks omitted). Plaintiff is not depicted as involved in the extra-marital affair, but as a sympathetic spouse of one of the parties to the affair. [13]  Nor does the Program taken in context depict her as responsible for her husband's death.  Quite the opposite, she appears shocked and saddened by the news and is definitively eliminated as a possible suspect, while disclaimers reinforce that "individuals depicted are innocent until proven guilty in a court of law" – also not a defamatory depiction.

Finally, a statement that a husband and wife are separated or getting divorced, if false, "would not in itself subject either of them to hatred, contempt or ridicule, nor tend to diminish the esteem, respect, goodwill or confidence in which each is held or to excite adverse, derogatory or unpleasant feelings or opinions against them." *Andreason v. Guard Publ'g Co.*, 489 P.2d 944, 945-46 (Or. 1971) (holding such statements not libelous; "mores change and . . . in modern society, when divorce or separation commonly results simply from the incompatibility of husband and wife, there is no significant diminution in esteem for those who legally separate or seek divorce.").

---

[13]  Plaintiff further complains that her husband, Mr. Brooks, and his lover, Ms. Washington, "met on Saturday, July 12, 2008 – not on July 8, 2008 as the Defendants would lead viewers to believe."  Am. Compl. ¶ 34.  Taking Plaintiff's allegations as true for purposes of this motion, this depiction is not capable of a defamatory meaning.

Here, Plaintiff makes broad, general statements of falsity, but does not specify any false statement or any possible defamatory meaning.   The litany of conclusory allegations, "naked assertions," and legal conclusions are "not entitled to the assumption of truth," and the Court need not – and should not – consider them.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Twombly*, 550 U.S. at 555.  Plaintiff's claims are not plausible on their face and should be dismissed.

### 2.      The Program Is Immune From Liability Under The Fair Report Privilege

The Amended Complaint fails to state a claim for defamation because the Program is protected by the fair report privilege.  The privilege shields defendants from liability for defamation for fair and substantially accurate reporting on "legal and official proceedings that are, in and of themselves defamatory" – just the sort of reporting contained in this Program. *Olukoya v. Sowore*, No. TDC-18-2922, 2019 WL 3501567, at *3 (D. Md. Aug. 1, 2019); *Piscatelli v. Van Smith*, 35 A.3d 1140, 1149 (Md. 2012).  The privilege is a qualified one that "simply requires that the report be fair and substantially correct."  *Olukoya*, 2019 WL 3501567, at *3 (citation and internal quotation marks omitted).   "Fairness and accuracy is satisfied 'when the reports are substantially correct, impartial, coherent, and bona fide.'"  *Id.* (citation omitted).

The Program accurately and fairly reports on a police investigation and court proceedings resulting from Mr. Brooks' murder.  From the face of the Program, it is clear that it follows the police investigation and trial, relying on the *bona fide* reports of law enforcement, prosecutors and defense attorneys involved in the case, as well as police reports and court records.  The Program is fair because it unequivocally eliminates Plaintiff as a suspect and includes her denials in a dramatization in which the actor portraying Plaintiff looks shocked at the news of her

16

husband's death and clearly denies any wrongdoing.  "Absolutely not," she says, shaking her head, "I loved him . . . I still cared about him."  (0:13:06.)

The Program then affirmatively states that Plaintiff was not the perpetrator of her husband's murder, explaining, "Police realize pretty quickly that Michael's wife could not have orchestrated this attack," (0:13:19), and she "has already moved on with her life, making jealousy a flimsy motive at best," (0:13:10), and "Felisha isn't behind this attack."  (0:13:24.) The Program devotes the majority of its 45 minutes to reporting on the investigation, apprehension and conviction of Mr. Washington, the actual murderer.  As a fair and true depiction of the police investigation and criminal court case, the depiction of Plaintiff in the Program is protected under Maryland's fair report privilege. *Saley-Radtke v. Hosmane*, 149 A.3d 573, 587 (Md. 2016).  *See also Nanji v. Nat'l Geographic Soc'y*, 403 F. Supp. 2d 425, 433-34 (D. Md. 2005) (granting motion to dismiss because word "rape" in article was a fair report of DOJ materials using term "sexual assault").

### 3.      The Program is Non-Actionable Opinion

If the Program can reasonably be read to depict Plaintiff as a suspect in her husband's death, or as "evil," Am. Compl. ¶ 42, and paints a picture that her husband was "utterly miserable" in their marriage, *id.* ¶ 17, and "free to live his life with his new girlfriend," *id.* ¶ 18, these depictions are non-actionable expressions of opinion.  To state a claim under the First Amendment, a defamation claim must be based on statements of fact, not opinion.  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974).  Whether a statement is one of opinion is a question of law.  *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092-93 (4th Cir. 1993); *Biospherics, Inc. v. Forbes, Inc.*, 989 F. Supp. 748,

751 (D. Md. 1997), *aff'd*, 151 F.3d 180 (4th Cir. 1998).  Courts routinely dismiss defamation cases on this basis alone.[14]

"The principle that opinions based on disclosed facts are protected is well established." *Agora, Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697, 704 (D. Md. 2000), *aff'd*, 111 F. App'x 99 (4th Cir. 2001); *Schnare*, 104 F. App'x at 852 (affirming dismissal where author accused plaintiff of lying to a court but also "disclose[d] the factual basis [and allowed] the reader to draw her own conclusion"); *see also Chapin*, 993 F.2d at 1093 (when "the bases for the . . . conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related").

The Program raises questions about whether Plaintiff could have been involved in her husband's murder before dismissing the theory, asking "**Is it possible** Felicia was so enraged . . . she did something drastic?"  (0:12:10 (emphasis added).)  The basis for this speculation is set forth for viewers to assess its viability for themselves:  "When that one person falls out of love and the other one doesn't then a lot of times a volatile situation can come from that."  "So volatile that detectives now **speculate** that the man who attacked Michael and Dorothy may have done so at Felisha's behest."  (0:12:30) (emphasis added).  A psychologist interviewed in the Program theorizes that "Anything's possible when love and passion are involved.  She could have hired somebody to kill him."  (0:12:38.)  These questions are not statements of fact provable as true or false but speculation which is protected non-actionable opinion.  Am. Compl. ¶ 25.  *See Abbas v. Foreign Policy Grp.*, 783 F.3d 1328, 1338-39 (D.C. Cir. 2015) (holding that

---

[14] *E.g.*, *Schnare v. Ziessow*, 104 F. App'x 847 (4th Cir. 2004) (*per curiam*); *Arthur v. Offit*, No. 01:09-cv-1398, 2010 WL 883745 (E.D. Va. Mar. 10, 2010); *Farah*, 736 F.3d at 531.

posing questions in an article does not make out a defamation claim and affirming dismissal under Rule 12(b)(6)).

Plaintiff herself casts the Program's treatment of her as "Defendants explor[ing]" a "theory."  But, alternative theories and speculation about a murder are protected opinion and cannot form the basis of a libel suit.  For example, in *Levin v. McPhee*, the plaintiff sued the author and publishers of non-fiction accounts of the death of a Russian dissident painter.  The plaintiff claimed that the book and article defamed him by reporting comments from people who knew the victim that implicated the plaintiff in his murder.  But the district court granted a Rule 12(b)(6) motion to dismiss the complaint and the Second Circuit affirmed.  119 F.3d 189 (2d Cir. 1997).  The court noted that "When the defendant's statements, read in context, are readily understood as conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not fact."  Id. at 197.  The *Levin* court emphasized that the book and article provided additional context – comments from a variety of individuals explicitly presented as different "versions" of the events that led to the painter's death.  The book and article thus made clear that the comments implicating the plaintiff were presented as opinion based on speculation. *Id.*

Here, as in *Levin*, the Program "uses a number of clear signals" (e.g., the language explicitly says that "detectives now speculate," and asks questions about what was "possible" and what Plaintiff, her husband, and the Washingtons "could" or "may" have done) "to indicate to the [viewers] that the versions of the events" presented in the Program "were nothing more than conjecture and speculation."  *Id.*  The Program also contains the relevant facts related to the police investigation and the various theories explored by law enforcement related to the subject murder.  And, as in *Levin*, the Article presents the full context, including the countervailing facts

19

that Plaintiff vehemently denied any wrongdoing, was not implicated in the murder, and that the

killer was found and convicted.  Thus, the reasonable viewer equipped with the fully-disclosed

facts to make up his or her own mind would understand that the challenged depiction of Plaintiff

is  non-actionable opinion presented as speculation.[15]

### 4.    The Program Was Not Broadcast with Fault

The Amended Complaint fails to state a claim for defamation as a matter of law because

it does not and cannot plausibly allege the requisite high degree of fault on the part of

Defendants.  Under the First Amendment, a plaintiff who is, as here, a limited purpose public

figure may recover for injury to reputation only on clear and convincing proof of actual malice, a

state of mind the Supreme Court has defined as "knowledge [of] . . . fals[ity] or . . . reckless

disregard of whether it was false or not."  *N.Y. Times Co.*, 376 U.S. at 279-80; *Watkins v. CNN*,

2018 WL 1970747, at *6 n.11 ("To establish actual malice for defamation purposes, a plaintiff

must prove by clear and convincing evidence that a defamatory statement was a 'calculated

falsehood or lie knowingly and deliberately published.'") (quoting *Capital-Gazette Newspapers,

Inc. v. Slack*, 445 A.2d 1038, 1044 (Md. 1982)).

Plaintiff is a limited purpose public figure – a question of law for the court to resolve,

*Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1294 n.12 (D.C. Cir. 1980)[16] – because she

---

[15] The Program does not, as Plaintiff claims, refer to or depict Plaintiff as "evil" but, if it did, that
too would be protected opinion.  *Boley v. Atlantic Monthly Grp.*, 950 F. Supp. 2d 249, 260
(D.D.C. 2013) (referring to a former Liberian minister as "evil" is "precisely the sort of
'imaginative expression' and 'rhetorical hyperbole' that the First Amendment protects").  Any
conclusions drawn about the state of her marriage are based on on-camera interviews with her
husband's siblings and the well-established fact that he was in a relationship with another
woman.

[16] The Fourth Circuit applies a five-factor test to determine whether a plaintiff is a public figure:
(1) plaintiff's access to channels of effective communication; (2) plaintiff's voluntary
assumption of a role of special prominence in a public controversy; (3) plaintiff's attempts to

was married to the victim of a highly publicized murder that was the subject of court proceedings and press, as the Program makes clear.  It is well established that "people closely related to such public figures in their activities must also to some extent lose their right to the privacy that one unconnected with the famous or notorious would have."  *See*, *e.g.*, *Carlisle v. Fawcett Publ'ns, Inc.*, 20 Cal. Rptr. 405, 415 (Cal. Ct. App. 1962) (dismissing claims of libel and invasion of privacy brought by Janet Leigh's first husband against publisher of article about Leigh's teenage years).

The Program also clearly addresses matters with which the public has legitimate concern – a cold-blooded murder, the prosecution of the suspect, and more broadly the efficacy of the American justice system.  The Fourth Circuit's conclusion in *Chapin* thus has great resonance in this case: "[T]he First Amendment's press and speech clauses greatly restrict the common law where the defendant is a member of the press, the plaintiff is a public figure, or the subject matter of the supposed libel touches on a matter of public concern.  Where, as here, all of these considerations are present, the constitutional protection of the press reaches its apogee."  993 F.2d at 1091-92 (internal citation and footnote omitted).

As a limited purpose public figure complaining about a Program about matters of public concern, Plaintiff is required to plead facts showing that Defendants acted with actual malice by clear and convincing evidence, but she cannot plausibly do so.  *See Gertz*, 418 U.S. at 331-32.  "The standard of actual malice is a daunting one."  *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996).  Plaintiff must plead the speaker knew the statements were false or

---

influence the outcome of the controversy; (4) existence of the controversy prior to publication of the statements; and (5) plaintiff's retention of public figure status at the time of the alleged defamation. *Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 668 (4th Cir. 1982).

"in fact entertained serious doubts as to the truth" when it made defamatory statements.  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *see also Henderson v. Claire's Stores, Inc.*, 607 F. Supp. 2d 725, 731-32 (D. Md. 2009), *aff'd*, 422 F. App'x 269 (4th Cir. 2011); *Henry v. Nat'l Ass'n of Air Traffic Specialists*, 836 F. Supp. 1204, 1212 (D. Md. 1993), *aff'd*, 34 F.3d 1066 (4th Cir. 1994).

The "actual malice" standard imposes a heavy burden on plaintiffs.  It "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant*, 390 U.S. at 731.  Rather, Plaintiff has the burden of pleading and ultimately proving that Defendants made the statements in suit with a "high degree of awareness of their probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).  As the D.C. Circuit has explained this bedrock Constitutional principle, a public-figure plaintiff could support a libel claim with allegations that a defendant was subjectively aware the story was "(1) fabricated; (2) so inherently improbable that only a reckless person would have put [it] in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that [plaintiff] had obvious reasons to doubt." *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003).  "For [the actual malice] standard to be met, the publisher must come close to willfully blinding itself to the falsity of its utterance." *Tavoulareas v. Piro*, 817 F.2d 762, 776 (D.C. Cir. 1987) (*en banc*) (citation omitted).  Plaintiff cannot clear this high hurdle, even at the pleading stage.

In the wake of *Iqbal* and *Twombly*, a plaintiff cannot state a claim simply by making conclusory assertions of the elements of actual malice, which is all the Amended Complaint does here.  Indeed, federal courts in the Fourth Circuit and across the country now routinely dismiss defamation cases for failure to state a claim where, as here, the plaintiff fails to plead allegations

to make actual malice plausible.[17]  Because the Program expressly relies on police and

prosecutors and other witnesses, reputable media, official records, and includes Plaintiff's own

denials, Plaintiff cannot plausibly meet the "daunting" standard of actual malice.[18]

First, reliance on interviews with police and prosecutors involved in the case and official

records cannot constitute actual malice.  *See Bell v. Associated Press*, 584 F. Supp. 128, 129, 132

(D.D.C. 1984); *CACI Premier Tech. v. Rhodes*, 536 F.3d 280, 292 (4th Cir. 2008). Second,

Plaintiff's allegation that Defendants "conducted little to no investigation concerning the truth or

veracity of their defamatory statements," (Am. Compl. ¶ 37), is not only belied by the careful

reporting evident on the face of the Program, but also is insufficient to establish actual malice.

*Ryan v. Brooks*, 634 F.2d 726, 728 (4th Cir. 1980).  "The law is well established that the failure

to investigate, without more, does not constitute actual malice."  *Don King Prods., Inc. v. Walt*

*Disney Co.*, 40 So. 3d 40, 46 (Fla. Dist. Ct. App. 2010).  Third, failure to seek comment from

---

[17] *E.g.*, *Salisbury Univ.*, 123 F. Supp. 3d at 761-62 (dismissing complaint that "does nothing
more than deliver a bare recitation of the legal standard for malice"); *Biro v. Condé Nast*, 963 F.
Supp. 2d 255, 288 (S.D.N.Y. 2013), *aff'd*, 80 F.3d 541 (2d Cir. 2015); *Parisi v. Sinclair*, 845 F.
Supp. 2d 215 (D.D.C. 2012); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50 (1st
Cir. 2012); *Mayfield*, 674 F.3d at 378; *Egiazaryan v. Zalmayev*, No. 11 Civ. 2670, 2011 WL
6097136, at *8 (S.D.N.Y. Dec. 7, 2011); *Hanks v. Wavy Broad., LLC*, No. 2:11cv439, 2012 WL
405065, at *12 (E.D. Va. Feb. 8, 2012); *Pan Am Sys., Inc. v. Hardenbergh*, 871 F. Supp. 2d 6, 17
(D. Me. 2012); *Diario El Pais, S.L. v. Nielson Co., (US)*, No. 07CV11295, 2008 WL 4833012, at
*6-7 (S.D.N.Y. Nov. 6, 2008).  *See also Hakky v. Washington Post Co.*, No. 8:09-cv-2406, 2010
WL 2573902, at *6-7 (M.D. Fla. June 24, 2010) (granting 12(b)(6) motion because "Plaintiff
failed to allege sufficient facts demonstrating . . . actual malice on the part of Defendants.
Although Plaintiff does point to specific statements in the Article that are false or misleading,
Plaintiff does not state . . . facts supporting that they were made with malice.").

[18] *Parisi*, 845 F. Supp. 2d at 219 (finding failure to plead actual malice when plaintiff cited
defendant's book showing defendant took steps to verify the statements and relied on multiple
sources); *Diario El Pais*, 2008 WL 4833012, at *6-7 (finding failure to plausibly plead actual
malice when complaint showed defendant took actions to ensure accuracy and thus it did not
possess a subjective belief of falsity).

Plaintiff – she claims "Defendants never interviewed or otherwise communicated" with her, Am. Compl. ¶ 41 – even if true, is also insufficient to show actual malice. *See Davis v. Costa-Gavras*, 654 F. Supp. 653, 657 (S.D.N.Y. 1987). *See generally* Hon. Robert D. Sack, *Sack on Defamation*, § 5:5.2 at 5-92 to 5-94, 5-99 to 5-100 (2011) (collecting cases) (failure "to investigate," failure "to obtain plaintiff's comments," failure to "present an objective picture," selective reporting of some facts but not others, belief in truth of information "despite the existence of a contradictory source" are all insufficient to constitute actual malice).  In fact, the Program includes Plaintiff's denials (0:12:50) – evidence of the **absence** of actual malice. *McFarlane*, 74 F.3d at 1304; *cf. Lohrenz*, 350 F.3d at 1286 ("[R]eporting perspectives at odds with the publisher's own 'tends to rebut a claim of malice.'").

Fourth, Plaintiff's complaint that the Program did not portray her marriage as she would have liked, Am. Compl. ¶¶ 17-20, is likewise insufficient.[19]  As to whether she was separated from her husband or whether divorce papers had been filed at the time of his death, *id.* ¶¶ 17-18, Plaintiff sets forth no facts asserting anything more than a mistake by Defendants, at most, which is insufficient to plead, or prove, actual malice.  *Time, Inc. v. Pape*, 401 U.S. 279, 290-92 (1971); *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 117 (D.C. Cir. 2017).[20]

---

[19] *See Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials – whether fair or unfair – constitute the exercise of editorial control and judgment.").

[20] Given that the Program was produced by a reputable production company, *see* Am. Compl. ¶6, Plaintiff cannot plausibly plead that TV One was negligent, much less acted with actual malice, in relying on and broadcasting the Program.  *See Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1032 (2d Cir. 1997) (publisher may not be liable for article "if it relies upon the integrity of a reputable author and has no serious reason to question the accuracy of the information provided by that author").  Indeed, TV One would have no reason to doubt its producers since other reputable news outlets had also published reports of the case without legal challenge.

Finally, Plaintiff's claim that the Program includes scenes that never happened or other "dramatic embellishments" does not establish actual malice. *Davis*, 654 F. Supp. at 57-59, involved a defamation claim arising, as here, from a docudrama, the film *Missing*, which the plaintiff claimed depicted him as responsible for the death of an American citizen during the 1973 coup in Chile. The *Davis* court found that the filmmaker defendants did not act with actual malice merely because nine scenes from the docudrama were "created," "distorted," or included "baseless suggestions." *Id.* at 657. The court noted that, in contrast to a documentary, which "maintains strict fidelity to fact," a docudrama is merely "based on a true story" and "partakes of author's license" in that it includes "simulated dialogue, composite characters, and a telescoping of events occurring over a period into a composite scene or scenes." *Id.* at 657-58. The court concluded that, as "a creative interpretation of reality," so long as "alterations of fact in scenes portrayed are not made with serious doubts of truth of the essence of the telescoped composite, such scenes do not ground a charge of actual malice." *Id.* at 658. "[M]inor fictionalization," the court noted, "cannot be considered evidence or support for the requirement of actual malice." *Id.*

The Sixth Circuit reached a similar conclusion in *Street v. NBC*, 645 F.2d 1227 (6th Cir. 1981), a libel case brought by one of the alleged victims of the Scottsboro boys. The suit arose from an NBC television drama that included fictionalized scenes and dialogue about the court case in which nine African-American teenage boys were accused of raping two white women. The court held that the dramatic liberties, which showed plaintiff in a poor light, did not constitute actual malice. *Id.* at 1237. The court explained that "controversial historical events" can cause people to "draw different lessons" and see the "events and facts in a different light." *Id.* But "[s]o long as there is no evidence of bad faith or conscious or extreme disregard of the truth, the speaker in such a situation does not violate the malice standard." *Id.*

25

Even if Plaintiff were deemed to be a private figure and a negligence standard applied – and it doesn't – the Amended Complaint must be dismissed because, on its face, it does not allege facts sufficient to state a claim under a negligence standard, the lower standard applicable to private-figure plaintiffs. *Boccone v. American Express Co.*, No. RDB 05-34336, 2007 WL 2914909, at *7 n.6 (D. Md. Oct. 4, 2007); *see also Gertz*, 418 U.S. at 347 (holding that states may not impose "liability without fault" in libel cases brought by private plaintiffs). As the Program reflects, Defendant Jupiter relied on police, prosecutor and the defense attorney who investigated and litigated this case, on official police and court records, a journalist, and articles previously published in reputable publications. The Program also includes Plaintiff's version of the facts in the Program. TV One, in turn, relied on a reputable production company – all factors that show, as a matter of law, not just lack of actual malice, but lack of negligence. *Watkins v. Washington Post*, 2018 WL 805394, at *7 (when reporters rely on other reputable sources, they are not "negligent, let alone acting with malice").[21] Accordingly, because the Amended Complaint contains no allegation of fault that could "raise a right to relief above the speculative level," it should be dismissed. *Parisi*, 845 F. Supp. 2d at 217.

### 5.    Plaintiff Fails to Plausibly Plead Substantially Falsity

The Amended Complaint also fails to state a claim for defamation as a matter of law because it cannot plausibly allege – much less prove – that any statement or implication in the Program, which is based on a court proceeding, police reports, and interviews with police

---

[21] *See also Winn v. United Press Int'l*, 938 F. Supp. 39, 45 (D.D.C. 1996) ("[A] periodical that relies on articles from other reliable publications is not negligent as a matter of law when it does not verify those articles with their original sources."), *aff'd*, 1997 WL 404959 (D.C. Cir. 1997); *Hakky*, 2010 WL 2573902, at *6 (dismissing libel claim against Washington Post because, in part, "under *Iqbal*, Plaintiff failed to allege sufficient facts demonstrating negligence or actual malice on the part of Defendants").

detectives and prosecutors, a journalist, and the victim's siblings, is substantially false.  Truth is an absolute shield to defamation liability, *Koren v. Capital-Gazette Newspapers*, *Inc.*, 325 A.2d 140, 143 (Md. Ct. Spec. App. 1974), and Plaintiff bears the burden of pleading and proving falsity.  *Watkins v. CNN*, 2018 WL 1970747, at *5 *Olukoya*, 2019 WL 3501567, at *7; *Murray v. United Food & Commercial Workers Int'l Union, Local 400*, 229 F. Supp. 2d 465, 476 (D. Md. 2003), *aff'd*, 100 F. App'x 165 (4th Cir. 2004); *Trundle v. Homeside Lending, Inc.*, 162 F. Supp. 2d 396, 400 (D. Md. 2001); *Telnikoff v. Matusevitch*, 702 A.2d 230, 246 (Md. 1997).

The law of libel "overlooks minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516-17 (1991).  "A false statement is one that is not substantially correct."  *Watkins v. CNN*, 2018 WL 1970747, at *5 (citation omitted). "If the gist or 'sting' of a statement is substantially true, 'minor inaccuracies will not give rise to a defamation claim.'"  *AIDS Counseling & Testing Ctrs. v. Group W Television, Inc.*, 903 F.2d 1000, 1004 (4th Cir. 1990) (quoting *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 601 (D.C. Cir. 1988)).[22]  Each alleged defamatory statement must be viewed in the context of the whole Program to fairly assess its alleged falsity.  *Olukoya*, 2019 WL 3501567, at *4 (citing *Heath v. Hughes*, 197 A.2d 104, 107 (Md. 1964)).

The disclaimer shown four times in the Program alerts viewers that the Program contains "dramatizations," a device that signals to viewers that there is some natural fictionalization and license taken in the depictions to fill in historical events and conversations and that it is not a

---

[22] *See, e.g.*, *Bustos v. A&E Television Networks*, 646 F.3d 762, 767 (10th Cir. 2011) (television program's suggestion that plaintiff was a "member" of a violent prison gang was substantially true, where plaintiff was not actually a member but "surely did *affiliate* with the organization"); *Nichols v. Moore*, 477 F.3d 396, 401 (6th Cir. 2007) (statement that plaintiff was "arrested in connection to" Oklahoma City bombing was substantially true, although plaintiff was only held as a material witness but had associated closely with the bomber).

word for word, verbatim account of the police investigation and court case.  Fictionalization that may occur in this medium – without more – cannot subject Defendants to liability as long as the gist of the characterization is accurate.  *See Partington v. Bugliosi*, 56 F.3d 1147, 1161 (9th Cir. 1995); *Seale v. Gramercy Pictures*, 964 F. Supp. 918 (E.D. Pa. 1997), *aff'd*, 156 F.3d 1225 (3d Cir. 1998); *Davis*, 654 F. Supp. 653, 658-59.  Plaintiff must also show that the allegedly defamatory depiction in the Program is not more damaging than a truthful report would have been.  *See Batson v. Shiflett*, 602 A.2d 1191, 1212 (Md. 1992) ("[A] statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." (citation and internal quotation marks omitted)) (citing *Masson*, 501 U.S. at 516-17); *Group W Television*, 903 F.2d at 1004 (same).

Here, even in the unlikely event questions were not raised about the spouse when a man having an affair has been killed outside his lover's apartment, the gist of the Program is that police affirmatively and swiftly eliminate Plaintiff as a potential suspect by Act 2.  And, even if Plaintiff and Mr. Brooks were still married at the time of his death, Am. Compl. ¶ 53, as she alleges, the Program's depiction of Plaintiff's marriage is not substantially false either.  Nowhere in the Amended Complaint does Plaintiff dispute that Mr. Brooks was engaged in an affair with Ms. Washington.  Nor could she.  It was the subject of an extensive police investigation – as police detectives state in on-camera interviews in the Program – because it provided the motive for Mr. Washington's highly-publicized murder of Mr. Brooks that resulted in his public trial and conviction.  It was a matter of court record, and discussed by the prosecutor in on-camera interviews.  (0:35:25; 0:36:55.)  And it was the subject of press reports, including a newspaper article shown in the Program that identifies the victim as Mr. Washington's "wife's ex-lover." (0:44:10.) The affair is also substantiated by Mr. Brooks' siblings on-camera.  Even if Plaintiff

and Mr. Brooks were still married at the time of his death, he was engaged in an extra-marital relationship and the depiction of that relationship has the same effect on the mind of the reader about Plaintiff's marriage as the truth would have, whether or not Plaintiff and Mr. Brooks were separated or a divorce finalized at the time of his death.[23]

A minor inaccuracy, if there were one here, that does not alter the gist or sting of the statement at issue is insufficient to sustain a defamation claim. *Dobkin v. Johns Hopkins Univ.*, No. 96-1715, 1999 WL 22901, at *4 (4th Cir. 1999) (*per curiam*); *Brown v. Ferguson Enters.*, 2012 WL 6185310, at *2; *Batson*, 602 A.2d at 1212. Accordingly, the Amended Complaint fails as a matter of law because it does not plausibly plead substantial falsity.

### C.    Plaintiff's Privacy Claim Fails as a Matter of Law

The Amended Complaint fails to state a claim for invasion of Plaintiff's privacy. As a threshold matter, under Maryland law "[r]egardless of whether a declaration is styled as a defamation action or an invasion of privacy action, the same considerations and legal standards apply." *Olukoya*, 2019 WL 3501567, at *8 (quoting *Group W Television*, 903 F.2d at 1004 n.1). *See also Piscatelli*, 35 A.3d at 1146-47 (holding it "superfluous" to analyze a false light claim after deciding the defamation claim failed). If there is immunity from liability for defamation, there is immunity from liability for other alleged torts. *Carr v. Watkins*, 177 A.2d 841, 843 (Md. 1962). Therefore, as Plaintiff's defamation claim necessarily fails, so, too, her privacy claim.

In addition, Plaintiff does not and cannot plausibly plead – as she must for an intrusion upon seclusion claim – unreasonable, intentional intrusion by physical or other means upon her

---

[23] Plaintiff's complaint that Mr. Brooks and Ms. Washington met each other four days later than the Program conveys, Am. Compl. ¶ 34, even if true, is a substantially true depiction and not actionable.

seclusion or privacy. *Reuber v. Food Chem. News*, 925 F.2d 703, 718 (4th Cir. 2009) (*en banc*). Intrusion claims typically involve secret taping or entering places where a person has a reasonable expectation of privacy – not reporting on matters that occur in public or, as here, a notorious murder, police investigation and trial that received media attention and was part of the public record.[24]

In addition, intrusion claims typically require surreptitious newsgathering or other activities, not – as here – mere publication of news reporting that is based on public records and press reports. *Reuber*, 925 F.2d at 718-19 (intrusion "requires a positive act by a defendant, aside from publication, that encroaches on a plaintiff's seclusion"). Plaintiff fails to allege, as she must against media defendants, some affirmative act of intrusion by Defendants other than publication of the Program. "Wrongful intrusion requires an intentional act." *McCauley v. Suls*, 716 A.2d 1129, 1134-35 (Md. Ct. Spec. App. 1998). For example, Plaintiff does not allege – nor could she – that Defendants used hidden cameras or secret microphones to record her in a place where she had a reasonable expectation of privacy. The Program merely dramatizes the very public events surrounding Mr. Brooks' murder, the police investigation, and Mr. Washington's ultimate apprehension, trial, and conviction. The depictions of Plaintiff are dramatizations using actors. No actual images or video of Plaintiff appear in the Program.

---

[24] *Compare New Summit Assocs. Ltd. P'ship v. Nistle*, 533 A.2d 1350, 1354 (Md. Ct. Spec. App. 1987) (peering through peephole in mirror in bathroom constituted intrusion) *with Pemberton v. Bethlehem Steel Corp.*, 502 A.2d 1101, 1117 (Md. Ct. Spec. App. 1986) (observation of person outside home, in store and on road not intrusion) *and Solomon v. National Enquirer, Inc.*, No. DKC 95-3327, 1996 WL 635384, at *3 (D. Md. June 21, 1996) (photos taken from street of plaintiff in bedroom window where she made no effort "to conceal herself from uninvited eyes" not intrusion), *Furman v. Sheppard*, 744 A.2d 583, 587 (Md. Ct. Spec. App. 2000) (surveillance of plaintiff "doing things that could be observed by non-trespassing members of the general public" did not violate plaintiff's reasonable expectation of privacy).

Finally, a plaintiff using an intrusion claim to seek non-pecuniary damages arising from speech must first meet the requirements of the First Amendment applicable to defamation claims. *Snyder v. Phelps*, 580 F.3d 206, 221 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011). As discussed above, Plaintiff's defamation claim fails for lack of falsity and actual malice, among other things. And so too her misplaced intrusion claim.

Plaintiff's privacy claim would be no better cast as one for publication of private facts. Plaintiff cannot plausibly plead that Defendants broadcast her "private facts in a highly offensive manner about an issue not of public concern." *Reuber*, 925 F.2d at 719. *See also Bilney v. Evening Star Newspapers Co.*, 406 A.2d 652, 659 (Md. Ct. Spec. App. 1979). Matters in the criminal court record are part of the public record and therefore are not actionable. *Pemberton*, 502 A.2d at 1118 (liability for "publication of truthful information contained in official court records open to public inspection" is prohibited by the First and Fourteenth Amendments) (quoting *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975)); *Interphase Garment Sols.*, 566 F. Supp. 2d at 467 (dismissing claim on the basis that "public court documents are not private facts").

Similarly, the state of Plaintiff's marriage and her husband's infidelity was not a private fact once her husband was murdered very publicly by his lover's ex-husband. Her husband's relationship with Ms. Washington became a matter of the public court record and the subject of news coverage about the trial. The "requirement that the information publicized be private in nature is both an element of the tort itself and is necessitated by First Amendment principles." *Pemberton*, 502 A.2d at 1118.[25]

---

[25] A lapse of time since the murder, police investigation, and conviction and the Program's broadcast does not establish an invasion of privacy under Maryland law. *Id.* at 1118 n.10.

### D.      Plaintiff's Other Tort Claims Fail as a Matter of Law

As for Plaintiff's other tort claims – intentional infliction of emotional distress and negligence – they are barred not only by basic principles of tort law, but also by the First Amendment.  Plaintiff seeks to effect an "end run" around the barriers the First Amendment imposes on litigants who assert that a news story, book, television program, or other expressive work falsely depicts them.  The First Amendment does not permit plaintiffs to sue over allegedly false content by invoking alternative legal theories to try to avoid all the requirements the constitution imposes on defamation and related tort claims.  "[A] plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim."  *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 319-20 (D.C. Cir. 1994) (citing *Cohen v. Cowles Media Co.*, 501 U.S. 663, 670 (1991)).  "The First Amendment considerations that apply to defamation therefore apply also to" Plaintiff's claims for intentional infliction of emotional distress and negligence. *Farah*, 736 F.3d at 540.[26]

This principle derives from the U.S. Supreme Court's decision in *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988), which, in dismissing Jerry Falwell's intentional infliction of emotional distress claim, held that, as a public figure, he could not use that tort to recover damages for a satirical advertisement.  The Supreme Court more recently extended that principle to private figures, in a case involving invasion of privacy claims.  *Snyder v. Phelps*, 562 U.S. 443 (2011).  In the lower courts, many decisions hold that when the gravamen of a claim is that the plaintiff was injured by false statements in a news report, book, TV program or movie,

---

[26]  *Cf. Hodge v. Coll. of S. Md.*, 121 F. Supp. 3d 486, 503 n.5 (D. Md. 2015) (*per curiam*) ("false light claim need not be assessed separate and apart from . . . defamation claim because '[a]n allegation of false light must meet the same legal standards as an allegation of defamation[,]'") (quoting *Piscatelli*, 35 A.3d at 1146-47), *aff'd*, 646 F. App'x 294 (4th Cir. 2016).

alternative legal theories may not be invoked to avoid First Amendment limitations on challenging allegedly false speech.  *See*, *e.g.*, *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999) (torts of fraud, trespass, and breach of fiduciary duty may not be invoked to recover damages for an allegedly false television broadcast).  Because Plaintiff's "defamation claim fails, so do [her] other tort claims based upon the same allegedly defamatory speech."  *Farah*, 736 F.3d at 540.

### 1.    The Amended Complaint Fails to State a Claim for Emotional Distress

In addition, its First Amendment failings, the Amended Complaint does not state facts to plausibly plead the elements of an emotional distress claim.  Under Maryland law, Plaintiff is required to prove (1) that Defendants' conduct was intentional or reckless; (2) that is was also extreme and outrageous; (3) that it caused emotional distress; and (4) that that the distress was severe.  *Batson*, 602 A.2d at 1216; *Harris v. Jones*, 380 A.2d 611, 624 (Md. 1977).  And, the Amended Complaint must plead and prove each element "with particularity."  *Wharton v. Columbia Pictures Indus., Inc.*, 907 F. Supp. 144, 146 (D. Md. 1995); *Carter v. Aramark Sports & Entm't Servs., Inc.*, 835 A.2d 262, 283 (Md. Ct. Spec. App. 2003) ("with specificity") (citation omitted).  It "is, in the first instance, for the court to determine" if the publication meets the test for outrageousness.  *Batson*, 602 A.2d at 1216.  Recovery for emotional distress is "meted out sparingly," in this Court, "its balm reserved for those wounds that are truly severe and incapable of healing themselves," *id.* – certainly not the case here.

Defendants must not only desire to inflict severe emotional distress upon Plaintiff, but also the conduct must be so outrageous and extreme "as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."  *Kelson v. Spin Publ'ns, Inc.*, No. HAR-87-16, 1988 WL 52192, at *3 (D. Md. May 19, 1988) (citation

omitted).  What is more, the "emotional response must be so acute 'that no reasonable person could be expected to endure it.'"  *Pemberton*, 502 A.2d at 1115 (citation omitted).  Here, Plaintiff's allegations are a far cry from the "extreme and outrageous" conduct, intent, or severe distress required to plead a claim for intentional infliction of emotional distress.  *Hatfill*, 416 F.3d 320 (if plaintiff unable to satisfy constitutional requirements to establish defamation claim against media defendant, unlikely plaintiff could prove defendant's conduct so intentional or reckless or sufficiently outrageous to support claim for emotional distress); *cf. Snyder*, 562 U.S. at 455-58 (the First Amendment bars recovery where the conduct is speech on a matter of public concern, even if such speech could be deemed extreme and outrageous).

The Program is made up mostly of dramatizations – as the disclaimer reminds viewers no less than four times – as well as interviews.  Very few actual crime scene photos are used.  No real dead bodies appear.  Instead, actors depict most of the events.  The disclaimer shown throughout the Program with a large "WARNING" in all capitals warns viewers that the Program contains "intense violence that may be unsuitable for some viewers," and that "Viewer discretion is advised."  Plaintiff's allegations do not even begin to approach the necessary level of "extreme" and "outrageous" conduct necessary to state a claim for intentional infliction of emotional distress.

### 2.      The Amended Complaint Fails to State a Claim for Negligence

Similarly, Plaintiff fails to state a claim for negligence.  Where defamation is alleged, "there is no separate claim for negligent publication."  *Tani*, 2009 WL 8652384, at *2.  Even if the Program contained inaccurate information – which it does not – there is no "special relationship" created between Defendants, TV producers and cablecasters, and Plaintiff and therefore there is no duty.  *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 762 A.2d 582, 596

(Md. 2000).  Accordingly, there can be no common law liability for negligence on Defendants'

part.  *Ginsburg v. Agora, Inc.*, 915 F. Supp. 733, 738-40 (D. Md. 1995) (holding that, in the

absence of a "special relationship" between publisher and newsletter subscribers "greater than

that between the ordinary buyer and seller," there is no negligence liability on publisher of

inaccurate but non-defamatory information that caused subscriber financial loss).

That Plaintiff is depicted fleetingly in the Program about the murder of her husband, a

matter of public record, does not create a special relationship.  If the rule were otherwise, the

media would be hampered in reporting on matters of public concern in the public record.  At

most, negligence is a potential standard of fault for Plaintiff's defamation claim, not a separate

cause of action here.  But, because the Program relates to matters of public concern and because

Plaintiff is a limited purpose public figure, the standard of fault applicable to Plaintiff's claim is

actual malice.  And, Plaintiff cannot meet that rigorous standard, as discussed above.

## IV.    CONCLUSION

For the foregoing reasons, the Court should find that, based on the face of the Amended

Complaint and Program incorporated by reference, the Amended Complaint fails to state a claim

and should be dismissed in its entirety with prejudice.


DATED:  October 25, 2019

Respectfully submitted,

_____/s/ *Constance M. Pendleton*_____
Lisa B. Zycherman (D. Md. Bar # 16969)
Constance M. Pendleton (*pro hac vice* pending)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, DC  20006
Ph: 202-973-4200; Fax:  202-973-4499
lisazycherman@dwt.com
conniependleton@dwt.com

*Counsel for Defendants TV One, LLC and Jupiter Entertainment*

36

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FELISHA BROOKS,                     )
                                   )
                Plaintiff,          )
                                   )
v.                                  )     Case No. 8:19-cv-02315-GJH
                                   )
TV ONE, LLC, *et al.*               )
                                   )
                                   )
                Defendants.         )


**PROPOSED ORDER**

Upon consideration of defendants TV One, LLC and Jupiter Entertainment's (the "Served Defendants") motion to dismiss, memorandum of law in support, declaration in support, exhibit, and any opposition thereto, it is

ORDERED that the Served Defendants' motion is granted, and that the Amended Complaint is DISMISSED WITH PREJUDICE.


Dated this _____ day of _____, 2019.


_____
UNITED STATES DISTRICT JUDGE

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 25, 2019, the foregoing Motion to Dismiss,

Memorandum of Law in support, Declaration of Constance M. Pendleton, and exhibit attached

thereto were served by ECF, email and first class mail, postage prepaid, upon:

Lanet Scott, Esq.
Scott Legal, LLC
9701 Apollo Drive, 100
Largo, MD 20774
Email:  lscott@lscottlawoffice.com

                                      /s/ *Constance M. Pendleton*